# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>A cellular telephone, with IMEI Number: 358912105734812, in custody of Homeland Security Investigations. | Case No.  '20 MJ2759 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC secs. 846, 841 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
See Attached Affidavit of [Insert Agency] Special Agent David M. Spear, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*David M. Spear*
*Applicant's signature*

Special Agent David M. Spear, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: July 10, 2020

*Judge's signature*

City and state: San Diego, California      HON. LINDA LOPEZ, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR SEARCH WARRANT

I, David M. Spear, being duly sworn, hereby depose and state as follows:

**A.     ITEMS TO BE SEARCHED**

1.     This affidavit is in support of an application by the United States of America for a search warrant to search the following electronic communication facilities:

   a.     An Apple iPhone, with IMEI Number: 356773084144015, seized from Justin Chalker ("Chalker"), and in the possession of the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") ("**Subject Telephone #1**");

   b.     An Apple iPhone, with IMEI Number: 359301067108570, seized from Chalker and in the possession of HSI ("**Subject Telephone #2**");

   c.     A cellular telephone, with IMEI Number: 353067109321572, seized from Harlan Higa ("Higa") and in the possession of HSI ("**Subject Telephone #3**");

   d.     A cellular telephone, with IMEI Number: 354836090727073, seized from Jon-Paul Sadami Pono Natto ("Natto") and in the possession of HSI ("**Subject Telephone #4**"); and

   e.     A cellular telephone, with IMEI Number: 358912105734812, seized from Brandon White (White") and in the possession of HSI ("**Subject Telephone #5**")(collectively "**Subject Telephones**").

2.     As supported by the facts presented below, the requested date range for the requested forensics analyses will be from *June 6, 2019 to February 1, 2020*.

*Location and Status of the Subject Telephones.*

3.     Since the **Subject Telephones** were seized, they have remained in the sole custody of agents involved in this investigation and are currently securely in evidence with HSI. The **Subject Telephones** have been maintained, as evidence, within a secure location maintained by the law enforcement. No one from the public has had access to the **Subject**

**Telephones.** The **Subject Telephones** have not since been tampered with or altered in any way and remain in the same condition as when they were seized.

4. Based on the information below, I have probable cause to believe that the requested information will lead to evidence of:

    a. Evidence of a crime,

    b. Contraband, fruits of a crime, or other items illegally possessed, and

    c. Property for use, intended for use, or used in committing a crime,

specifically, violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 843(b) (unlawful use of a communication facility (including the mail) to facilitate the distribution of a controlled substance), and 846 (conspiracy to distribute controlled substances).

5. Because this affidavit is intended to show that there is sufficient probable cause in support of the application for the requested warrant, it does not purport to set forth all of my knowledge of or investigation into this matter. I am familiar with the facts and circumstances of the investigation from my participation in the investigation, my review of law enforcement reports, affidavits, and speaking with agents who were personally involved in multiple controlled purchases. Conversations and discussions below are set forth in substance unless noted. I have included in parentheses or in brackets my explanations of coded or veiled speech, based on my training and experience, as well as my familiarity with the facts of this investigation. Dates and times are approximate.

**B.**    **TRAINING & EXPERIENCE**

6. I am a Special Agent with the HSI. I have been a Special Agent with HSI since December of 2016. I am currently assigned to the ICE/HSI Office of the Deputy Special Agent in Charge, in San Diego, California. I have completed 23 weeks of intensive training in criminal investigations at the Federal Law Enforcement Training Center in Glynco, Georgia (2017-2018). As a result of my training and experience as a Special Agent, I am familiar with federal criminal statues to include violations of Title 8, 18, 19 and 21 of the United States Code.

7. Before being employed by HSI, I worked as a United States Border Patrol Agent in the San Diego Sector for approximately thirteen and a half years. Through my training and experience as a Border Patrol Agent, I became aware of the methods that drug traffickers engage in to accomplish their drug trafficking operations. During my experience in law enforcement, I have had training in narcotics investigations. I have participated in numerous debriefings of informants who had personal knowledge regarding narcotics trafficking. Additionally, I have had training in many aspects of drug investigations including undercover operations, conducting surveillance, and arrests.

8. I have participated in and conducted investigations of violations of various Federal criminal laws, including those related to narcotics violations. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. I have had training in investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, §§ 841(a)(1), 846, 843(b) and Title 18, United States Code, §§ 922(g)(1).

9. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced with the illegal distribution and importation of controlled substances, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

*Training and Experience Relative to the use of Cellular Telephones*

10. Based upon my training and experience, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs; use cellular telephones, email messages, and text messages to facilitate drug activity. I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without limitation,

the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, the use of multiple vehicles as conveyances for drugs and drug proceeds, and the installation of false/hidden compartments ("traps") in those vehicles to covertly transport drugs and drug proceeds.

11. I also know from training and experience that drug traffickers periodically change, discard, or "drop" their telephones and/or telephone numbers in an attempt to avoid law enforcement scrutiny or interception of their conversations. Moreover, it is my experience that drug distributors purposefully use multiple communication facilities (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

12. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for drug smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers and portable radios to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of "hard" drugs, such as methamphetamine and cocaine. Typically, couriers smuggling controlled substances across the border are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Drug smugglers and their organizations use wire and electronic communications, in part, because these individuals believe law enforcement is unable to track the originating and destination telephone numbers of calls placed to and from cellular and/or digital communication facilities.

13. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

  a. Drug traffickers will use cellular telephones because they are mobile and they have instant access to telephone calls, text messages, the internet, electronic internet based communications, and voice messages.

  b. Drug traffickers will use cellular telephones to communicate with other coconspirators, sources-of-supply and perspective purchasers, to monitor and coordinate their drug acquisition, transportation, and distribution activities.

  c. Drug traffickers will use cellular telephones because they are able to actively monitor the progress of their drugs while the transportation conveyance is in-transit.

  d. Drug traffickers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their drugs will arrive at predetermined storage or distribution locations.

  e. Drug traffickers will use cellular telephones to coordinate and direct co-conspirators and/or purchasers to an exact drop off and/or pick up location at a particular agreed upon time.

  f. Drug traffickers will use cellular telephones to notify or warn their co-conspirators of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

  g. Drug traffickers and their co-conspirators often use cellular telephones to communicate with load drivers who transport their drugs and/or drug proceeds.

  h. The use of cellular telephones by co-conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to e-mail messages, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

14. Subscriber Identity Module ("SIM") cards, also known as subscriber identity modules, are smart cards that store electronic data for cellular telephone subscribers. Such data includes user identity, location and telephone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence

generated by a drug trafficker's use of a cellular telephone would likely be stored on any SIM card that has been utilized in connection with such a cellular telephone.

15. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, telephone logs and contacts, voice and text communications, and data such as e-mail messages, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these drug distribution conspiracies, that a search of such cellular telephones yield evidence:

    a. tending to indicate efforts to acquire, import, transport and distribute federally controlled substances from Mexico into and within the United States;

    b. tending to identify other, facilities, storage devices, and/or services– such as email addresses, IP addresses, and telephone numbers – that may contain electronic evidence tending to prove the acquisition, importation, transportation, and distribution of federally controlled substances;

    c. tending to identify co-conspirators, criminal associates, or others involved in the acquisition, importation, transportation, and distribution of federally controlled substances;

    d. tending to identify travel to or presence at locations involved in the acquisition, importation, transportation, and distribution of federally controlled substances;

    e. tending to identify the user of, or persons with control over or access to such cellular telephones; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the acquisition, importation, transportation, and distribution of federally controlled substances.

**C.    FACTS ESTABLISHING PROBABLE CAUSE**

*Introduction*

16.    On February 1, 2020, investigating agents conducted an undercover controlled sale of ten kilograms of cocaine. The aforementioned cocaine was sold to four individuals who traveled to the Southern District of California to make the purchase. These four individuals were Chalker, Higa, Natto, and White. The **Subject Telephones** were all possessed, respectively, by these four individuals at the time of their arrests following the cocaine purchase. Each defendant had one cellular telephone, except for Chalker who had two.

*Preliminary Communications with Chalker*

17.    During June 6, 2019, an undercover agent ("UCA-1") received an unplanned and unrecorded call from Chalker and a confidential informant who was with Chalker.[1] UCA-1 was introduced to Chalker, over the telephone, as an individual who could assist in the acquisition and transportation of controlled substances. Chalker provided UCA-1 with his telephone number so that Chalker and UCA-1 could communicate with each other directly.

18.    Subsequent communications [and one face to face meeting in Hawaii] between Chalker and UCA-ultimately led to Chalker's planned purchase of cocaine from UCA-1 in the Southern District of California. This planned purchase of cocaine is discussed in greater detail below.

/ / /

/ / /

---

[1] This confidential informant provided information to investigating agents about Chalker. However, the government does not here intend to rely on the information provided by this confidential informant in support of the instant affidavit. Rather, the government submits this particular unrecorded conversation between Chalker and UCA-1 [UCA-1 acting in the undercover role of a person who could assist in the acquisition and transportation of controlled substances] as a starting point for the requested forensic analyses of the **Subject Telephones**.

***Chalker Coordinates the San Diego Cocaine Purchase.***

19. Prior to the February 1, 2020 controlled sale, during a series of saved electronic communications between Chalker and UCA-1, Chalker discussed his need to acquire an additional source of supply for drugs.

20. Specifically, On January 27, 2020, Chalker messaged UCA-1 stating, "Yo brother, you free?" UCA-1 responded, "Ill call u in 15 mins bro." Chalker then replied, "Cool, bro. I got a lot of BIG movements and I'm starting to see my guy can't keep up; I'll be ready."

21. That same day, during a recorded conversation between Chalker and 'UCA-1, Chalker stated that he had some "big things coming up" and that "We've grown too big for my guy." Chalker also stated that he had "family" in Canada who were asking for "a hundred pieces a week, at around $20 a pop."

   a. Based upon training and experience, your affiant knows that Chalker is referencing to 100 kilograms of cocaine at the price of $20,000.00 per kilogram.

22. Chalker then stated that he was going to travel to Los Angeles and wanted to meet up with UCA-1 to negotiate prices and quantities. Chalker stated that he was looking to get five of his "regular." Based on pervious conversations with Chalker, agents understood "regular" to mean cocaine.

23. On January 28, 2020, during a series of saved text messages between Chalker and 'UCA-1, UCA-1 messaged Chalker, "Let me know bro so I can have the regular [cocaine] and the green one [marijuana] ready for you. Chalker responded, "Sounds good bro, I'm still trying to collect paperwork [purchase money] on my end, but I'd love to sit down and go over everything. UCA-1 replied, "Ok. Let me know what time you'll be available.

24. On January 29, 2020, during a series of saved messages between Chalker and 'UCA-1, Chalker messaged, "I'm still in Hawaii but leaving tomorrow night. Be in town Friday morning." UCA-1 replied, "Ok. Let me know." Chalker then messaged, "Thanks bro."

8

25. On January 31, 2020, UCA-1 sent Chalker a picture of cocaine bricks.

***Chalker Travels from Hawaii to California to Purchase Cocaine***

26. On February 1, 2020, during a recorded telephone call between Chalker and UCA-1, Chalker explained that he was in Torrence, CA and that he had business to take care of, after which he would travel to meet UCA-1. UCA-1 then asked what time Chalker would travel to meet UCA-1. Chalker then addressed other individuals who were with him, one apparently named "Harlan" [Higa] and another "JP" [Natto].

27. UCA-1 then asked if Chalker wanted to "pick something up" and Chalker replied that he had, "all the paperwork [drug purchase money] in my office." Chalker explained that he had come to California for "a green [marijuana] deal" but he also needed "regular" [cocaine]. Chalker stated that he wanted, "10 of the regular [10 kilograms of cocaine] ones." UCA-1 proposed that Chalker could purchase five kilograms of cocaine and that UCA-1 would give Chalker five kilograms of cocaine on credit. Chalker replied, "I have the paper work for 10 [ten kilograms of cocaine] and I got the paperwork for like 50 cold ones." From prior communications with Chalker, "cold ones" was understood to mean methamphetamine. Chalker stated that he was also looking for, "30 milligrams blues" and "disco pills."

   a. Based upon your affiant's training and experience, and recorded communications of Chalker, "blues" is a reference to tablets of oxycodone and "disco pills" is a reference to tablets of MDMA.

***Chalker and his Co-Conspirators Arrive in San Diego County***

28. Later that same day, Chalker arrived to meet UCA-1, accompanied by three adult males, later identified as co-defendants Natto, Higa, and White (collectively "Defendants"). Thereafter, Defendants and UCA-1 traveled to a nearby location where the actual sale would take place. The entire meeting in the aforementioned nearby location was audio and video recorded.

/ / /

/ / /

9

29. Upon arrival, Defendants entered the building where the meeting/purchase was to occur. Upon entering, Defendants were directed to black gym bag ("Black Bag') which contained approximately 10 kilograms of cocaine (Schedule II).

### *Each Defendant Participates In the Inspection of Cocaine*

30. UCA-1 then stated that Defendants could open one or two bricks to see that that cocaine was real. Natto and Higa then cut open and inspected one of the kilogram bricks of cocaine. Natto indicated that he was impressed by the quality of the cocaine and requested permission to open and inspect all the remaining kilogram bricks of cocaine. UCA-1 stated that Defendants could open all ten kilogram bricks if they intended to purchase all of them. Higa and Natto then opened all ten kilogram bricks of cocaine and Natto smelled each brick. Natto then gave White a testable amount of cocaine and White orally tasted the cocaine.

31. After inspecting each of the ten kilogram bricks of cocaine, Defendants stated that they were interested in purchasing the cocaine, but that the purchase money had stayed in Los Angeles. UCA-1 thereafter agreed to let Defendants take the cocaine and return that night with payment. UCA-1 took a picture of White's driver's license as an assurance that Defendants would return with the purchase money. Defendants then sealed the cocaine bricks and placed them back into the Black Bag. After Chalker took physical possession of the gym bag, all four Defendants were taken into custody.

### D. **CELLULAR TELEPHONE SEARCH METHODOLOGY**

### *Procedures for Electronically Stored Information*

32. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services, and rudimentary word processing. An increasing number of cellular service providers now

allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

33. Following the issuance of this warrant, I will subject the **Subject Telephones** to analysis. All forensic analysis of the data contained within the **Subject Telephones** and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

34. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

E. **CONCLUSION**

35. Based on the foregoing, I believe there is probable cause to believe that the **Subject Telephones** were being used to facilitate violations of Title 21 U.S.C., Sec. 841(a)(1) – Distribution of Controlled Substances and 21 U.S.C., Sec. 846 – Conspiracy to Distribute Controlled Substances, and that an order authorizing the search of Subject Telephones is warranted.

36. Because the **Subject Telephones** were promptly seized at the time of Defendant' arrest and given that they have been securely stored, there is probable cause to believe that evidence of illegal activities committed by Defendants continues to exist on the **Subject Telephones.**

**WHEREFORE**, I request that the Court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the item described in Attachment A and the seizure of items listed in Attachment B, using the methodology described above.

*David M. Spear*
_____
David M. Spear
HSI Special Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __10__ day of July, 2020.

_____
The Honorable Linda Lopez
United States Magistrate Judge

# ATTACHMENT A

A cellular telephone, with IMEI Number: 354836090727073, seized from Jon-Paul Sadami Pono Natto ("Natto") and in the possession of HSI ("**Subject Telephone #4**").

# ATTACHMENT B

**A.    ITEMS TO BE SEIZED**

The following evidence, to be searched for and seized pertains to violations of violations of Title 21 U.S.C., Sec. 841(a)(1) – Distribution of Controlled Substances and 21 U.S.C., Sec. 846 – Conspiracy to Distribute Controlled Substances and found to have been created or possessed from ***June 6, 2019 to February 1, 2020***:

1.    Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

   a.    tending to indicate efforts to acquire, transport, and distribute cocaine, methamphetamine, marijuana, oxycodone, MDMA, and other federally controlled substances;

   b.    tending to identify other facilities, storage devices, or services - such as email addresses, IP addresses, telephone numbers - that may contain electronic evidence tending to efforts to acquire, transport, and distribute cocaine, methamphetamine, marijuana, oxycodone, MDMA, and other federally controlled substances;

   c.    tending to identify co-conspirators, criminal associates, or others involved in efforts to acquire, transport, and distribute cocaine, methamphetamine, marijuana, oxycodone, MDMA, and other federally controlled substances;

   d.    tending to identify travel to or presence at locations involved in the acquisition, importation, transportation, and distribution of cocaine, methamphetamine, marijuana, oxycodone, MDMA, and other federally controlled substances. Including evidence tending to identify or exclude travel to or presence at locations where distribution activities took place;

   e.    tending to identify the user of, or persons with control over or access to, the **Subject Telephone**; or

   f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.